The next case for today is case number 415-1026, Danner v. Rexroat. For the appellant, we have Mr. Fleming, and for the appellee, we have Mr. Carpenter. You may proceed, counsel. May it please the court, counsel. This is a little bit of a different situation in that I'm the appellant, having filed the initial appeal. Mr. Carpenter did file a cross appeal on this case, and I think actually his cross appeal is probably the more involved question here. And I assume if we're doing the usual 20 minute a piece approach that I'll need to speak to his appeal as part of my initial presentation, so I'll plan on doing it that way. This case involves the effect of a deed that sprang out of a 1999 Texas divorce between David and Ann Rexroat, and the question was the effect of that deed on the portion of land that Mr. Rexroat owned in Cass and Morgan counties, and particularly on a part of that land that's referred to as Tracts 1 and 2 throughout the record. I think it's fair to say that the drafting in this case was probably less than perfect. We think the intention of the parties is clear, and that's paramount in this case. The trial court, we think, correctly found that there was no question, as the court said, that the intent of the parties was to equally divide all of the farmland and real estate that David owned in Illinois, including the part that he owned in Cass. And the only mistake made by the trial court, which is the basis for our appeal, is that after holding that the deed did equally divide his interest in the land that he co-owned with Karen, that the part that he gave half of that would go to his ex-wife, half of it he would keep, and the court held that the half that he gave would go to his ex-wife. The part that he kept was still owned in joint tenancy with Karen. It was our position below, and it is here, that that's error. In fact, that when the joint tenancy was severed by that deed, that it was severed as to the entire interest. That's in particular because after the deed was reported and the transfer occurred, the remaining interest that Mr. Rexfrod had was effectively a one-eighth interest. The interest that his sister Karen had was still effectively a one-fourth interest, and the unity of interest was destroyed by that deed. Quite frankly, I don't think there was any argument in response to our position, realistically either in the trial court or on appeal, that that's the correct result if the deed, in fact, affects the severance of the joint tenancy as the trial court ruled, as we believe was correct. The cross-appeal from Mr. Carpenter argues that the deed did not affect joint tenancy property in the first place, so that you don't even get to the issue of severance. What's your answer to that? Because it seems to me, when you look at the special warranty deed from Mr. Rexfrod to his wife during the divorce, it lays out a description of the six tracts, and then it says, being the same tracts one through six, particularly described in the certain quick claim deed from Carol D. Rexfrod to C. David Rexfrod, and it dated a certain date. Now, there was a separate deed from Nellie to David and his sister, isn't that how they got their joint tenancy? Right, that's correct. So how does this special warranty deed include that property, is my question. Well, because the deed itself specifically refers to the basis for the deed as being the divorce decree, settlement agreement between the parties, which was entered into just a few weeks before, approved by the court just a few weeks before. And the divorce decree says, not unusually, that all of Mr. Rexfrod's farmland and real estate in Illinois is to be divided equally. 50% is awarded to her, 50% is awarded to him. Part of his ownership interest in Illinois real estate was this portion of tracts one and two that he owned jointly with his sister. The divorce decree doesn't say anything to separate that interest out. Would the legal description in Nellie's deed to Mr. Rexfrod and his sister be different than the legal descriptions that are contained in this document called the special warranty deed? That's a certain chunk of land, and the deed from David's father to him that conveyed other pieces of land also conveyed a half interest, because David's father and Nellie owned that tracts one and two together. He conveyed his half interest to David as part of the deed that's referenced that the court referred to. Right, so wouldn't her description and what she conveyed to him and his sister be different? No, I think she conveyed her half, and it was still an undivided half interest in tracts one and two. And as the court knows, and it gets very esoteric here, but it's not something where you could look at the plat map and say, well, here's tracts one and two. We'll just draw a line down the middle. This is Nellie's half and this is Carol's half. They each own an undivided interest in the whole thing. It's just a question of whether it's an interest in common or an interest as a joint tenant. So I think from that standpoint, the legal description is the same. The interests are just different. And again, the divorce decree, which was the basis for the deed, says we split all the real estate, all of his interest, half to him, half to her. So there's no way that could exclude the portion that he received from his aunt Nellie that he owned jointly with Karen. That wouldn't necessarily be included. So I think what happened was the deed was inartfully drafted. It didn't say 50% of his interest. It just said a 50% interest. And I think, in fact, at least most, if not all, of the other tracts that were involved, he owned outright. So it was a full 50% interest. This one was a little more confusing. And again, it could have easily been addressed differently without question. But again, without question, as the trial court found, the intent of the divorce decree was specifically stated. Each party gets half, 50%. And the deed was clearly intended to carry that out and specifically references the divorce decree as the basis for the deed. And of course, basic rules of construction of deeds require that the entire deed be looked at when looking at the four corners and trying to determine intent. And case law that we've cited, such as the Warren Boynton decision of the Supreme Court back in 1988, say that the four corners includes the opportunity to consider the circumstances under which the deed was drafted, especially when there's something referred to specifically in the deed, such as the divorce decree, so that in sitting down and taking a look at this, the court is not prohibited from looking at the deed and only looking at the deed and even seeing the reference to the divorce decree, but saying, well, I can't look at that. I can't consider anything that's outside the deed itself. And when you look at the divorce decree, when you look at the whole picture, again, it's clear. He was giving her half of everything he owned. So I think it's realistically that simple. And it's kind of curious in this case that the parties to the agreement, David and Ann, David now through his estate, and Ann, who's now Ann Duncan, who was a party to the case in the trial court, those parties agreed on what the agreement meant. As she set forth in her affidavit, which was considered by the trial court on the summary judgment motion, it's the third party, Karen Danner, who's not a party to the agreement, but who had an ownership interest in some of the land, who's stepping in to say, wait a minute. And of course, she's not a party to the deed either. And she's trying to challenge the effect and meaning of the deed and the agreement, which, again, I think is pretty unusual where the parties agree and the third party is challenging that. But, again, from a standpoint of the severance issue, if you, in our appeal, if you start with the premise that the court correctly ruled that the deed did work with severance, did convey half of his interest in the joint tenancy property, I think it's pretty much indisputable that that worked with severance and that his remaining one-fourth was not held in joint tenancy any longer with Karen, so that she had her fourth interest, he had his one-eighth interest in that, plus his quarter interest in the other part of the property, and Ann had a quarter interest and an eighth interest, so that she and David each ended up with a three-eighths interest in the property with Ms. Danner owning the other quarter, and that was an even split. That's part of the problem with their argument, I think, is that if you do it their way and you end up giving Ann Duncan, a full half interest in that in tracts one and two, and by their approach, David would have ended up with just a quarter interest and everything else is divided 50-50, that doesn't carry out the intention of the parties, which is clearly to divide everything 50-50. So I think for the court to have stepped in and ruled against that intent would have clearly been wrong and the judge did not do that. He ruled in accordance with the intent of the parties. We think correctly that the only mistake being made was ruling that the joint tenancy was not fully suffered. So we're asking that the court affirm the decision as to the effect of the deed on the joint tenancy property, but reverse it as to the court's determination that there was not a severance work as to the share that was retained by Mr. Rexrow, which now would be owned by his estate, and determine that Ms. Danner continues to have her quarter interest, effective quarter interest, and the estate and Ms. Duncan, he's shown, creates interest in tracts one and two. It should be the proper result. Thank you, counsel. You'll have additional time on rebuttal if you wish. Thank you. Mr. Carpenter? Thank you, counsel. May it please the court. I agree with Mr. Fleming that this case is resolved by the court construing and determining the meaning and the effect of the 2000 deed from David to Karen, but of course we differ considerably on how that should be construed and what effect that deed actually did have. You meant David to Ann. David to Ann, excuse me. It's the defendant's position that the 2000 deed conveyed a three-eighths interest to Ann, when in fact the deed itself says an undivided 50 percent interest. It doesn't say 50 percent of David's interest. It says a 50 percent interest. Reference is also the conveyance to David from his father in which he was conveyed a 50 percent interest. We need to look first, of course, at the deed itself. I think the deed has no ambiguity. It says I am warranting and guaranteeing ownership to Ann of a 50 percent interest in the property that's described on the attached. And then it also references the conveyance from his father. There's nothing ambiguous about saying an undivided 50 percent interest. This is a divorce where he's dividing up with Ann half his property? He's dividing up his property, Your Honor. I guess if we look at the divorce decree, it says 50 percent him, 50 percent her. There is no way that this deed can do what the divorce decree says. Well, how about this as a thought? Take everything David owns as an interest in real property and divide it up in half. Wouldn't that accomplish that? Had the deed been worded in such a way as to do that, yes, but it's not. Well, it's a undivided 50 percent interest. Isn't that what it means? We're dividing it in half? No. I don't think that's what the deed says. The deed says I am guaranteeing to Ann a 50 percent interest in the real estate described on the attached. And then it references the deed from his father. It doesn't say half of what I own. It's an undivided one-half interest in the property described. And then it references Carol's. Undivided one-half interest meaning in what I own. Isn't that what it says? That's not what it says. Isn't that what it's meant? Here's the other question. This is at a time, this is 20 years ago or something, right? If there's a divorce and they're dividing it all up, everything else 50-50, why would he not be just dividing this up 50-50? Why would he care? Why would she care? I want 50 percent of what you own, David. Okay. And here it is. So now as a result, she owns 37.5 percent and he owns 37.5 percent. Wouldn't that be an equal division? Well, perhaps if we don't take into consideration the other factors that are involved, Your Honor. Well, from the point of view of the people involved in the divorce, there are really no other factors other than making an even split. Well, there is the factor of the fact that David acquired his interest in two different transactions, a quarter from Nellie and a half from his father. The conveyance from Nellie was 1973 prior to the marriage. Would any of that matter to Ann? To Ann? Yes. Remember, this is a divorce. They're dividing it up. She's got a lawyer. We've talked about some considerable property here, right? Yes. She's got a lawyer. He's got a lawyer. They're dividing it up. Why would she care how he came into ownership of the interest he had? Because she indicates in her affidavit, Your Honor, that they were aware of Karen's interest in this property. However, in the documentation that was prepared, the deed that was prepared, made no reference to it, made no allowance for what was already the share that was already owned by Karen. If you have Ann, she wants half of what David owns, and she pretty much got it, didn't she? I mean, that's really what we're – this is a divorce. I want half – this is a long-time marriage. I want half of what you got. He says, okay, here we go. But I think there are other considerations, Your Honor. I think what really happened here is that David agreed to convey a one-half interest to Ann. He did that by this deed, knowing full well that he owned a half interest together with Karen, was willing to continue in ownership of that one-fourth interest with her as joint tenant. As the court reflected, he probably didn't want to give up the chance of receiving something in the event Karen died before him. Their very close brother and sister had received this property, the Nelly deed, prior to the marriage, the one from his father after their marriage. I'm intrigued by the way the court uses the expression, the marital property of David. I don't know if the court was using that as a term of art or not, but certainly the deed from Nelly given prior to the marriage would not make that one-fourth interest marital property. So I think with that context in mind, that this deed that says on its face that it's warranting the ownership of a one-half interest, transfers to Ann the one-half interest that he received from Carol, as well as a half interest in the other property that's not a part of this, and that that context of the long-term ownership some, what, 17 or 14 years before this conveyance from his father, I think David was really intending to maintain that. I think it's important to consider that he... If that was his intent, couldn't they have made that brother more clear than they did? If it was his intent to convey half of his interest in the real estate... I mean, we're talking about, you know, I got these two different tracks of property here. I mean, David's sitting in your office, and he tells you he wants to do what you just suggested to us he wants to do. How hard would it have been for you to figure out a way to draft it so that would be reflected in the deed? Certainly it could be, and I would also... And nothing in this deed comes close, does it? That's correct. And nothing in this deed says that he is guaranteeing ownership of anything less than 50%. What would we be faced with if this property had been sold prior to David's death? Karen comes in for a one-fourth. David and Ann now argue over how much each of them gets. She holds up this warranty deed that guarantees that she owns a 50% interest. Now, for her own purposes, the purposes of her family, now she's taking a different position. Oh, no, no, we were just kidding. I wasn't getting a three-eighth. Getting a half interest, I was getting three-eighths. Well, now she's saying she received less than the deed said that she was getting. How in the world can title companies be expected to examine deeds of this nature? As, in fact, it shows in the record here that the local title company examined this deed, unbiased, third party, determined from the language used that Ann received a half interest in this deed, the other half was still in the names of Karen and David, and then at his death that went to Karen. I realize that finding is not conclusive on the court, but how can we set up a situation in which title companies are asked to guarantee ownership of a substantially valuable piece of property and chase down to Texas to find the decree and then find that the decree has no legal description of it? They could always decline because it's ambiguous. That's one of their opportunities. Well, that's just our point that we don't think it is ambiguous. It says 50%. But as I say, David gave a special warranty deed. It wasn't a quick claim deed. All the other deeds in the chain of title here that we're discussing, Nellie, Carol, those are all quick claim deeds. I'm giving you whatever I have. David could have given a quick claim deed here. Half of what I have would have been very simple. He didn't do that. I don't think David knowingly would have taken on the liability of guaranteeing conveyance to Ann of a half interest if he wasn't intending to do it. What about the missing exhibit? On the divorce decree? Yes. Any significance to that? It would be nice to see what it said. Maybe it says something that would have clarified this. We don't know, but it's not there. So we have to do the best we can without it? I guess we do. Okay. My point, though, is that this deed cannot do more than it says it does and cannot do less than it says it does. It says it conveys a half interest. It doesn't say a three-eighths interest in tracts. Well, it occurs to me, I didn't do divorce work, but if I were Ann's lawyer and she said, what has this given me, I'd say it gives you half of what David had. That's not what the deed says. Well, that's kind of how it reads, and it's consistent also with the rest of the context of the divorce decree where it was pretty much a 50 percent split. But this is a deed that is put of record for people to rely upon and stake their, not lives, but their fortunes upon. It would have been so easy to say 50 percent of my interest, but he guaranteed she owned 50 percent. It's also, I think, of some significance that there's no reciprocal deed back from Ann to David. Admittedly, she didn't own any interest in the property, so it wasn't necessary. But quite often on divorces, there is a reciprocal deed back from the other party to establish 50 percent. Well, that wasn't done here. And it's our position, Your Honor, that there really is no evidence to support the trial court's finding, which, by the way, I don't think is binding on this court. that it was David's intent to convey 3-8's interest instead of 50 percent interest. I want the court to look particularly at Ann's affidavit. Now, that affidavit was filed in connection with a cross-motion for summary judgment. She had ample time to state her case, state her situation just as clearly and completely as possible, never subject to cross-examination. What that affidavit says is that she gets 50 percent of the farm. It doesn't say 50 percent of David's interest. It also does not say what David was to have after that was over. That would have been very easy to put in the affidavit. She didn't say it. She says that they knew about Karen's interest. She doesn't say how they were addressing that interest. So I think with the silence that we have in that affidavit, it shows that, in fact, it was her expectation to be receiving a 50 percent interest in the farm. And that's what the agreement of the parties was. When did Ann fill out the affidavit? Beg your pardon? When did she fill it out? It was while the motions for summary judgment were pending, Your Honor. But it was filed in connection with the hearing on the motions for summary judgment before the court's ruling. Was that in 2014? Probably so. And this deed and the divorce was 1999? Yes, the affidavit is November 15th of 2012. She hopes it is. Yes, November 2012. That's just before the hearing on the motion for summary judgment. Mr. Carpenter, was it argued to the trial court that the motion for summary judgment the quick claim deed from Nellie to David and Karen resulted in non-marital property? That never came up, Your Honor. The first time marital was ever mentioned in these proceedings, to my knowledge, was in the court's judgment when Judge Reif described the marital property that was to be divided. And as I say, whether that was intended as a work of art and truly what marital property is in Illinois law, I don't know whether he intended that or not. The divorce decree in Texas didn't address non-marital property? I don't know, Your Honor. You know, sometimes an order will say each party's non-marital property to them. To my knowledge, it did not, but I'm not closely familiar with it. Now, did the warranty deed also split the outstanding mortgages as to all tracts between David and Ann? It provided that they would each be responsible for half of the mortgage debt. She would hold him harmless for one half of that. Is there any inference to be drawn from that that would assist us in determining what the intent was? Well, I believe so, because if she is taking on half of the debt, then certainly she would be wanting to take on ownership of half of the farm, including Tracts 1 and 2. Why would she agree to indemnify for something she's not receiving? That's half of David's debt, isn't it? It's not half of the debt owned by everybody, it's half of David's debt. No, it's in the deed. Half of the mortgage on that property is what the deed in particular refers to. Of course, our position to the court is that David had two very separate and distinct interests in this property. A quarter interest received from Nellie in 1973, a half interest received from Carol in 1987. Defendants even acknowledged that when they posed the issue, does a transfer of a part of David's interest in the real estate sever the joint tenancy of his remaining interest? I say, absolutely not. He transferred a half interest to Ann, had no effect on his remaining interest in joint tenancy with Carol. The defendants seek to lump together his three-fourths interest, as if that's being somehow split and conveyed by the deed, which, of course, does not say that it is. The 2000 deed references the deed from Carol, makes no reference to the deed from Nellie. Now, we have a canon of construction. I had to write it down because I don't speak Latin, but expressio unius exclusio alternis. Mentioned the deed from Carol, but did not mention the deed from Nellie. The implication, then, is having mentioned the deed from Carol, we were conveying what came from Carol. Having excluded the deed, any reference to the deed from Nellie, we're excluding that. It's just that simple. It wasn't to be included in what he was conveying. I do want to address a couple of... I referred to them in my notes as red herrings in this matter. In their brief, the defendants, the reply brief, contend that we could have filed a reformation and gotten this deed straightened out. Well, this case had been pending for four years. And if the defendants felt that they had a cause of action for a reformation of this deed, to say something other than what it says and means, then they had ample opportunity to do that. The other point I wanted to make in that regard is, Mr. Fleming has mentioned the fact that a third party is interfering with what the parties agreed the deed meant. Well, of course, David's estate, now that he has died, and David himself, although the estate is a representative of his, could very well have entirely different ideas about this. Although the estate and Anne may agree for their own purposes to have a three-eighths conveyance, even though instead of half, because then that gives them the entire three-fourths, instead of just a half. To suit their present purposes, they're taking a position that Anne never took in her affidavit, she never took prior to the pendency of these proceedings, and in fact, I think, really does not have any cognizance. I can't think further. Thank you, counsel. Any further argument, Mr. Fleming? Mr. Fleming, what about the fact that the deed from Nellie to Karen and David constituted non-marital property because that property was acquired prior to the marriage? Well, the problem with that, Your Honor, is that I don't see anything in the judgment of divorce that indicates that there's any non-marital property recognized and set aside to Mr. Rexroth. And quite frankly, I think between the agreement itself, and I acknowledge that if Exhibit A had been attached there, it would be probably definitive. And since it's not, we can't be certain. But it just references the farmland in Illinois, which appeared to include everything. And it's certainly not unusual when parties have been married for a fair amount of time that if they've got large amounts of property and there's some non-marital property here, that that's just kind of thrown in the hopper. That's not my experience. Well, as a divorce lawyer, I certainly would not recommend that to my clients either. But I have seen it happen before. And the affidavit that Ms. Duncan signed does indicate that the intent of the parties was to convey all of the property or convey half of all of the land that he owned in Illinois without any – doesn't make any distinction between marital and non-marital. And quite frankly, although I think it's a very intriguing point, it's not something that came up in this case at all. It was not argued in the trial court in any way, shape, or form. So I would submit that that's not something that the court could use as a determining factor in this case. There's a number of things I want to try to say here in response to Mr. Carpenter's argument, and I probably will not get them all in. But I think the trial court found that David's intent was to convey, in essence, three-eighths of the cracks, one and two, because he owned three-fourths. He was conveying half of those because of the fact that that's what the agreement said, the divorce agreement. And there's nothing in there to indicate that they intended to treat the interest that he owned with his sister any differently than everything else. There's nothing that says – it doesn't say she gets half of everything except for the part that I have with my sister, which I'm keeping over here. And the suggestion that David might have thought, well, gee, I'd like to hang on to my share of joint tenancy property as such, because if Karen dies before me, then I keep the whole thing. There's absolutely nothing in the record to support that. It's pure speculation, and the trial court did not go that route. There's nothing in the record that I recall, relevant to this issue at least, that has to do with the closeness of the siblings or any other thing about their relationship. So I don't think that is something that had any bearing in the trial court and is not in the record for this court to consider. But the intent was as set forth in, again, the divorce agreement. And I think we have to keep looking at that and keeping in mind, once again, that the deed itself expressly references the divorce agreement as the basis for the deed. And this was done in, I think it was about six weeks between the approval of the court order, I think that was December 17th, 1999, and the recording of the deed, which I believe, or the signing of the deed, which I believe was February 2nd of 2000. So these documents clearly, under the cases we've cited, have to be and should be construed hand-in-hand and together, even aside from the fact that the deed expressly references the divorce judgment. And once again, there's no question that, in response to the court's questions to Mr. Carpenter, that these documents could have been drafted more artfully to point in either direction. But the fact is that, if you look at the deed and you see the reference to the divorce agreement, you can't construe the deed without looking at that, without considering these other circumstances. And the Diaz and the Herzog or the Hrvac case that we cited in our brief say that, that you need to consider. You can't even sit there and say, well, there's no ambiguity. If someone raises the question that there is something else the court needs to consider, the court can look at that to determine if there is some latent ambiguity. You can't tell if there's a latent ambiguity without considering the other document or circumstances. Counsel, I'm sorry, you're out of time. Thank you. Thank you, Your Honor. We'll take this matter under advisement and view recess.